**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KELLY E. B.,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO. 25-cv-5098** |
| | : | |
| **FRANK BISIGNANO,** | : | |
| **Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE** **September 24, 2026**

Kelly E. B. (Plaintiff) brought this action seeking review of the Commissioner of Social Security Administration's (SSA) decision denying her claim for Social Security Disability Insurance (SSDI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 (the Act). This matter is before me for disposition upon consent of the parties. For the reasons set forth below, Plaintiff's Request for Review (ECF No. 8) is **DENIED**.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed the instant application for disability benefits on February 15, 2023, alleging disability beginning January 3, 2023, due to her mental health and a learning disability (R. 171-77, 199). Her application was denied at the initial level on July 28, 2023, and upon reconsideration on January 18, 2024. (R. 68-87). On February 4, 2024, she requested a hearing before an Administrative Law Judge (ALJ). (R. 105-06). On July 1, 2024, Plaintiff, represented by counsel, and a vocational expert testified at the administrative hearing. (R. 49-67). On August 1, 2024, the ALJ issued a decision unfavorable to Plaintiff. (R. 14-33). Plaintiff

appealed, and the Appeals Council denied Plaintiff's request for review on July 7, 2025, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. (R. 1-6).

On September 5, 2025, Plaintiff filed a complaint in this Court, (Compl., ECF No. 1), and three days later she consented to my jurisdiction pursuant to 28 U.S.C. § 636(c). (Consent, ECF No. 4). On February 19, 2026, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review. (Pl.'s Br., ECF No. 8). The Commissioner responded on March 11, 2026. (Resp., ECF No. 9). Thus, this case is fully briefed and ripe for disposition.

## II. FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.[1]

Plaintiff was born on December 7, 1972, and was 50 years old on the amended alleged disability onset date. (R. 206). She completed high school, flight attendant school and a health advocate program. (R. 200). Her past relevant work includes work as a patient representative and patient advocate. (R. 200).

### A. Medical Evidence

Plaintiff has treated with psychiatrist Robert E. Nelson, M.D., at DGR Management, Inc. (DGR) since at least 2016. (*See* R. 298-456). Prior to alleged disability onset, these visits focused primarily on medication management for her depressive symptoms of lack of energy and motivation, tearfulness, inability to focus, anhedonia, mood disorders, anxiety, hopelessness, and

[1] Plaintiff's claim implicates only her mental health impairments. Accordingly, the Court omits discussion of evidence relating to any physical impairments.

forgetfulness. (*Id.*). Dr. Nelson frequently, although not always, linked her mental health problems to stress stemming from her children and marriage (including a temporary separation from the family) and, later, from her work. (*Id.*). However, mental status examinations throughout this period were largely normal, with fair appearance, normal speech, a lack of abnormal or psychotic thoughts, fair insight and judgment, intact memory and attention/concentration, full orientation, and mostly neutral (but sometimes depressed and anxious) mood. (R. 323).

Following alleged disability onset, Plaintiff continued to visit Dr. Nelson monthly throughout 2023. (R.627-46). At the March visit, she reported going into "shutdown mode" when exposed to "triggers," although Dr. Nelson expressed optimism that their prior discussions might prove "quite helpful to her in the long run." (R. 628). The following month she was stable, but there remained periods when "she does not do very well," and she was having trouble keeping up with house tasks. (R. 630). In May 2023, she was "fairly distraught" due to conflicts with her husband and children. (R. 632). She reported continued careless mistakes, short-term memory problems and disorganization, and Dr. Nelson offered his belief that she would encounter "significant difficulty working" given her prior multiple failed attempts. (*Id.*). However, the next month she was "doing better" after a medication adjustment, notwithstanding ongoing family strife largely due to financial concerns. (R. 635).

When she visited Dr. Nelson in August 2023, she complained of increased lability following the denial of her social security claim, as well as social anxiety causing her to leave group settings and difficulty concentrating when she becomes anxious. (R. 637). At a pair of September 2023 appointments, she was initially "somewhat distraught," anxious and depressed, but by the end of the month she was "doing better," despite consistent family problems. (R. 639,

641). At her November and December 2023 visits, she reported "still going through very stressful time" with her family, although she also reported cleaning her son's barbershop weekly. (R. 643, 645). She also had difficulty remaining current with her medication due to losing it and financial and insurance issues. (*Id.*).

On June 8, 2023, mental consultative examiner Angel Chiodo, Psy.D., noted that Plaintiff was partially hospitalized for four months in 2021 and that she continues to see a therapist biweekly at DGR and take prescribed Cymbalta, Abilify, Lamictal, and Adderall. (R. 515; *see also* R. 269-97 (records regarding 2021 partial hospitalization for "worsening depression and anxiety" following the death of her former boss, conflicts with new boss, and separation from her husband, with symptoms of poor attention and concentration, frequent crying, intermittent intrusive thoughts about loved ones dying, diminished personal hygiene, struggling to get out of bed, and feelings of hopelessness, helplessness, and worthlessness)). At the examination, Plaintiff reported sad moods, crying spells, irritability, restlessness, death fixation, excessive worry, difficulty concentrating, self-isolation, anhedonia, apathy, indecisiveness, fear of being judged, guilt and hopelessness. (R. 515). Upon examination, she was slightly disheveled with otherwise satisfactory appearance and demonstrated a restricted affect and dysthymic mood, but she had good insight and judgment and no issues with speech, thought processes, orientation, or attention and concentration. (R. 516-17). Her memory was mildly impaired due to a below average intellect (IQ of 87 upon testing), but her fund of information was appropriate for her experience, and she exhibited normal behavior throughout the examination. (R. 516-18). Plaintiff reported activities of daily living (ADLs) consisting of personal care, meal preparation, cleaning, laundry, shopping, using public transportation, driving, listening to music, and using a cellphone including occasional social media use, but she denied managing money, socializing, or

engaging in hobbies or interests. (R. 518). Dr. Chiodo assessed Plaintiff's prognosis as "[f]air given her history of maintaining long-term employment" and recommended continued mental health treatment and vocational training and rehabilitation. (*Id.*).

In the attached Medical Source Statement of Ability to Do Work-Related Activities (Mental), she further opined that Plaintiff had no limitations in understanding, remembering and carrying out simple instructions and making judgments on simple work-related decisions; mild limitations in understanding and remembering complex instructions; and moderate limitations in carrying out complex instructions, making judgments on simple work-related decisions, responding appropriately to usual work situations and to changes in a routine work setting, and interacting appropriately with the public, supervisors, and coworkers. (R. 520-21). Dr. Chiodo cited as the basis for these findings Plaintiff's "below average intellect," "apathy" and "depression." (R. 521). She diagnosed Plaintiff with generalized anxiety disorder and major depressive disorder, recurrent, moderate. (R. 518).

On June 16, 2023, State agency psychological consultant John Gavazzi, Psy.D., opined that Plaintiff had mild limitations in understanding, remembering or applying information and moderate limitations in interacting with others, adapting or managing oneself, and concentrating, persisting, or maintaining pace. (R. 73). Specifically, he determined that she had moderate limitations in her abilities to maintain attention and concentration for extended periods of time; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (R. 74-75). However, Dr. Gavazzi concluded that

Plaintiff was not significantly limited in any of the other 12 categories of adaption, social interaction and sustained concentration and persistence limitations. (*Id.*). Upon reconsideration on January 17, 2024, State agency psychological consultant Roger Fretz, Ph.D., reached the same conclusions. (R. 85-86).

Plaintiff also attended group therapy at Reading Hospital from November 7, 2023, through at least July 2, 2024. (R. 654-775). She frequently failed to complete assigned homework but generally participated in sessions. (*Id.*). She sometimes presented as mildly depressed and anxious and often reported struggling with emotional regulation due to conflicts with her husband and stress generated by her sister moving in. (*Id.*). Furthermore, at times she experienced increased symptoms due to not taking her medication. For example, on April 16, 2024, she reported a "very up and down" mood after her psychiatrist refused to prescribe her any more stimulants for her attention deficit hyperactivity disorder ("ADHD"). (R. 726). Plaintiff told her counselor that because of her ADHD "she had had issues with losing prescriptions and having to get her medication refilled sooner than she should," although she denied misusing them. (*Id.*; *see also* R. 759 (counselor advising Plaintiff to give new prescribed medication a chance to work before psychiatrist would consider re-prescribing Adderall)).

On May 22, 2025, licensed psychologist Katarzyna Lesniak-Karpiak, Ph.D., conducted a psychological evaluation of Plaintiff "due to reported concerns about ongoing emotional processing issues and problems dealing with stress." (R. 34; *see also* R. 38 (Plaintiff "was seen by this evaluator with a goal of clarifying her clinical presentation and providing some suggestions regarding her further treatment")). Dr. Lesniak-Karpiak noted that Plaintiff had experienced several recent external psychosocial stressors. (*Id.*). Reported symptoms included "anxiety, emotional ups and downs, and trauma reactivity." (*Id.*). Plaintiff further described

lifelong difficulties with emotional regulation, understanding others and trust. (*Id.*). The testing by Dr. Lesniak-Karpiak was ordered to determine what emotional and cognitive issues might be contributing to Plaintiff's symptomology. (*Id.*). It showed her to have cognitive skills ranging from borderline/low average to average. (R. 36). Upon neurocognitive screening, she had difficulty with sustained attention, processing speed and accuracy, sitting still, time management, and memory (especially immediate), although she retained "intact skills in appreciating emotional expressions." (R. 36-37). Dr. Lesniak-Karpiak added that Plaintiff's history of emotional functioning showed symptoms consistent with attention disorder, mood dysregulation, anxiety, eating disorder, autism and borderline personality disorder and diagnosed her accordingly. (R. 37-38).

To improve Plaintiff's insight and interpersonal skills, Dr. Lesniak-Karpiak recommended working with counselors to better understand social signs and acceptable behavior, to engage in roleplay to practice acceptable workplace behavior, and to participate in activities that stimulate social interaction. (R. 39). In addition, she suggested that Plaintiff participate in "interventions" that would specifically address her anxiety, depressive symptoms, social problems and perceived cognitive challenges, including trauma counseling for her anxiety and depression and "rehabilitation approaches" for her cognitive issues. (R. 39). Lastly, Dr. Lesniak-Karpiak proposed that Plaintiff undergo mindfulness training and work with a counselor regarding how to utilize relaxation techniques and more effectively cope emotionally. (R. 40).

**B. Nonmedical Evidence**

The record also contains nonmedical evidence. On April 5, 2023, Plaintiff completed an Adult Function Report. (R. 209-16). In the section asking about how her conditions limit her ability to work, she primarily described losing her friend and work supervisor to an illness and

stated that her "life has never been the same" since the passing. (R. 209, 215). She described ADLs of taking her daughter to school some days, washing dishes and laundry, shopping for groceries, caring for two dogs (with help from her family), cooking, and cleaning for her elderly parents. (R. 210-13). She denied having any hobbies and claimed that her personal care was limited. (R. 210, 213). She does not manage money, although she can count change. (R. 212). Plaintiff also checked boxes indicating that she has difficulties with memory, completing tasks, concentration, understanding, following instructions and getting along with others. (R. 213). Elsewhere on the form she clarified she "never had work related issues before" having difficulties with coworkers at her prior job, although she acknowledged being "afraid" and "paranoid" around authority figures. (R. 214). Further, she recorded that she can only pay attention for five minutes unless she is watching television, struggles with written and oral instructions, cannot handle stress or changes in routine, does not trust anyone, fears abandonment, and worries about her loved ones. (R. 216).

Plaintiff testified at the July 1, 2024, administrative hearing that she stopped working in January 2023 due to "meltdowns," paranoia, fear of authority figures, racing thoughts, and an inability to concentrate. (R. 53). She elaborated that following a contentious virtual meeting with her supervisor and department head about her remote work she had a panic attack and submitted a request for a leave of absence backed by a doctor's recommendation, but they denied it and deemed her to have quit. (R. 53-54). She claimed to be "definitely spiraling" after her employment ended, with ongoing anxiety, excessive worry, forgetfulness, inability to follow through, defensiveness, guilt, crying spells, tearfulness, nausea, headaches, racing pulse, diminished hygiene, and self-isolation. (R. 57-58). Plaintiff described ADLs of visiting her parents and cleaning for them weekly, shopping (albeit very slowly due to indecisiveness),

caring for her dogs, cooking and performing house chores, although she sometimes does not complete them. (R. 59).

## III. ALJ DECISION

Following the administrative hearing, the ALJ issued a decision in which she made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2027.
2. The claimant has not engaged in substantial gainful activity since January 3, 2023, the alleged onset date (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe impairment: cervical degenerative disease, carpal tunnel syndrome, major depressive disorder, generalized anxiety disorder, attention-deficit hyperactivity disorder ("ADHD"), and borderline personality disorder (20 CFR 404.1520(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), except frequent reaching, handling, and fingering; occasional overhead reaching; frequent postural maneuvers; no climbing of ladders, ropes, or scaffolds; no exposure to heights; and limited to simple routine tasks with simple decisions, occasional changes in the workplace, and occasional

interaction with co-workers and supervisors, but no direct public interaction.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on December 7, 1972 and was 50 years old, which is defined as an individually closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 3, 2023, through the date of this decision (20 CFR 404.1520(g)).

(R. 17-29). Accordingly, the ALJ found Plaintiff was not disabled. (R. 29).

## IV. LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §

1382c(a)(3)(A). A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits [her] physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform [her] past work. If the claimant cannot perform [her] past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. § 416.920(a)(4). The disability claimant bears the burden of establishing steps one through four. If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, she is able to perform substantial gainful activities in jobs existing in the national economy. *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited. A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal

issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V. DISCUSSION

### A. The Parties' Positions

Plaintiff raises a single claim that the ALJ "erred in the determination that she was not disabled" throughout the relevant period. (Pl.'s Br., ECF No. 8, at 2). At its most specific, Plaintiff's argument appears to be that "the administrative law judge failed to properly analyze and consider of [sic] the Plaintiff's treating mental health providers in formulating the Plaintiff's residual functional capacity." (*Id.* at 7).

Most of Plaintiff's argument or "Statement of Issues" section in her brief consists of background law and a summary of the ALJ decision and record evidence.[2] (*See generally id.* at 2-8). In this summary, she highlights her hearing testimony regarding her worsening "anxiety and depression which made her unable to retain the computer system" and her ongoing struggles with ADLs. (*Id.* at 3-4 (citing 53, 57, 59)). She also cites her "long history of treatment for mental health issues" with hospitalizations in 1996 and 2021 and group therapy at Reading Hospital from late 2023 through mid-2024. (*Id.* at 4-5 (citing R. 654-775)). Additionally, she points to her 2023 treatment notes with Dr. Nelson setting forth her diagnoses, associated symptoms, and troubles with ADLs. (*Id.* (citing R. 628-30, 632, 634)). Similarly, she catalogues her disorders and symptoms as discussed in the psychological evaluation performed by Dr. Lesniak-Karpiak. (*Id.* (citing R. 34)). After recounting her RFC and the VE's testimony, she complains that the ALJ improperly credited the opinions of the State agency consultants who

---

[2] Curiously, although Plaintiff's brief also includes a "Statement of Facts" section, none of this latter information is presented therein. (*See* Pl.'s Br., ECF No. 8, at 1-2).

never examined her and the consultative examiner who examined her only once and reviewed no records over "the opinions and findings of the treating mental health providers," without meaningfully or substantively explaining this decision even though the evidence was consistent with her testimony. (*Id.* at 7 (citing *Burnett*, 220 F.3d at 121)). She declares that her symptoms and limitations as recorded by Reading Hospital and Drs. Nelson and Lesniak-Karpiak "would certainly impact [her] ability to perform substantial gainful activity." (*Id.*). In closing, she posits that these records establish that she would be off-task 15 to 20 percent of the workday or miss two to three workdays per month, thus making her unable to work at any exertional level according to the VE's testimony. (*Id.* (citing R. 65-66)).

The Commissioner responds that this Court should deem waived Plaintiff's vague and underdeveloped claim because she fails to supply any evidence to support it or identify any treating source opinions or specific findings that the ALJ supposedly ignored. (Resp., ECF No. 9, at 4-5 (citing *Atkins v. Comm'r of Soc. Sec.*, 810 F. App'x 122, 129 (3d Cir. 2020) and *Woodson v. Comm'r of Soc. Sec.*, 661 F. App'x 762, 765-66 (3d Cir. 2016) for the proposition that "[j]udicial review does not require the reviewing court to comb through the record to uncover unarticulated arguments or supporting facts to make the moving party's case") (additional citations omitted)). Regarding the treating providers' findings, in particular, he observes that the ALJ thoroughly and accurately summarized Plaintiff's mental health treatment notes. (*Id.* (citing R. 23-25)). Lastly, the Commissioner points out that Plaintiff's declaration that unspecified treatment records "clearly establish" that she would require certain work-preclusive restrictions is not supported by any citation to the evidence and thus also not properly before this Court. (*Id.* (citing *Conroy v. Leone*, 316 F. App'x 140, 144 n.5 (3d Cir. 2009); *Laborers Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir.

1994))).

**B. Analysis**

"'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairments." *Burnett*, 220 F.3d at 121 (citing *Hartranft*, 181 F.3d at 359 n. 1; 20 C.F.R. § 404.1545(a)). An ALJ is required to consider and discuss all probative evidence detailing whether a claimant suffers from an impairment that could affect his or her ability to perform work-related activities. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201 (3d Cir. 2008) (citing *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001)). Broadly, evidence is anything that the claimant submits relating to his or her claim and includes objective medical evidence, medical opinions, and "other medical evidence."[3] 20 C.F.R. § 404.1513(a)(1)-(3). The first category consists of medical signs and laboratory findings. *Id.* § 404.1513(a)(1) (citing 20 C.F.R. § 404.1502(f)). Second, medical opinions regarding (as relevant here) mental health are comprised of "statement[s] from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in . . . understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting . . . ." *Id.* § 404.1513(a)(2)(ii). And, thirdly, "other medical evidence" is evidence that fits into neither of the foregoing categories, such as "judgments about the nature and severity of [the claimant's] impairments, [his or her] medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." *Id.* § 404.1513(a)(3).

---

[3] The regulations further identify two other types of evidence not at issue here, "evidence from nonmedical sources" and "prior administrative medical finding[s]." 20 C.F.R. § 404.1513(a)(4)-(5).

If evidence meets the regulatory definition of a medical opinion, the ALJ must articulate its persuasiveness using several factors, the most important being supportability and consistency. 20 C.F.R. § 404.1520c(b)(2); *see id.* § 404.1520c(c)(1) ("supportability" is the extent that a medical source presents "relevant . . . objective medical evidence and . . . supporting explanations"); *id.* § 404.1520c(c)(2) ("consistency" is the extent to which the medical opinion is consistent with evidence from other medical and nonmedical sources). 20 C.F.R. § 404.1520c(c)(1)-(2). However, the ALJ will no longer give specific evidentiary weight, including controlling weight, to any medical opinions, even from a claimant's treating providers. 20 C.F.R. § 404.1520c(a).

Here, Plaintiff suggests that the ALJ overlooked "the opinions and findings" of three mental health treatment providers: Reading Hospital, Dr. Nelson and Dr. Lesniak-Karpiak. (Pl.'s Br., ECF No. 8, at 7). But, taking these two categories in order, nowhere does she identify any medical opinions from these sources. Reading Hospital, as an entity rather than an individual, does not meet the regulatory definition of an "acceptable medical source" qualified to offer a "medical opinion." 20 C.F.R. § 404.1502(a)(1)-(8) (listing eight types of *individual* providers). The same is true for the licensed professional counselors (LPCs) who authored the overwhelming majority of the records from Reading Hospital, insofar as Plaintiff intends to refer to these providers individually. *See Zumwalt v. Astrue*, 220 Fed. App'x 770, 780 (10th Cir. 2007) (LPCs are not acceptable medical sources). Moreover, these "Daily Progress Notes" from group therapy sessions would not be "medical opinions," even if generated by an appropriate source, because they do not comment upon her functionality in light of her impairments. (*See* R. 654-775); *see also* 20 C.F.R. § 404.1513(a)(2). The treatment notes from visits with psychiatrist Dr. Nelson, although certainly an acceptable medical source, fail as proffered medical opinions

for this same reason. (*See* R. 627-46); *see also* 20 C.F.R. § 404.1513(a)(2). Further, the psychological evaluation conducted by licensed psychologist Dr. Lesniak-Karpiak, although also an acceptable medical source, is most accurately characterized under the regulations as "other medical evidence," not a "medical opinion." (*Compare* R. 34-45 (breaking evaluation into separate sections for, *inter alia*, "Developmental and Medical History," "Test Results," "DSM Diagnoses," and "Diagnosis Impressions and Recommendations," *with* 20 C.F.R. § 404.1513(a)(3) ("Other medical evidence . . . include[es] judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis."))). Critically, Plaintiff wholly fails to explain how any of this evidence constitutes a "medical opinion" requiring further articulation pursuant to 20 C.F.R. § 404.1520c, even after the Commissioner pointed out this deficiency in his response. (*See generally* Pl.'s Br., ECF No. 8, at 2-8; *see also* Resp., ECF No. 9, at 4-5).

Additionally, to the extent that Plaintiff argues that the ALJ failed to discuss these "findings," she is again incorrect. (Pl.'s Br., ECF No. 8, at 7). The ALJ addressed the records from these three providers when she wrote:

> Early mental health records from DGR Management, Inc. detailed multiple medication adjustments over the years and focused on marital issues and problems at work following the death of her supervisor. Just prior to the alleged disability onset date, in December 2022, the claimant reported that she was doing much better, as she had returned to the family home and was re-establishing her relationship with her husband following an extended separation. However, she described continued problems at work due to being told that she could not work remotely, despite the fact that they were hiring other remote workers. Upon follow-up in February 2023, the claimant reported that she was no longer working due to progressively worsening anxiety in the work setting. At that time, the claimant presented as fairly groomed with an anxious mood and affect, but logical thought processes, linear associations, fair insight and judgment, and intact memory, attention, and concentration (Exhibit 2F). Follow-up medication

> records continued to describe the claimant as fragile and distraught over family issues and insurance problems resulting in an inability to afford therapy with stable mental status findings (Exhibit 11F).
>
> . . . .
>
> Subsequent outpatient records revealed labile moods, intense anxiety in group situations and having to leave the house, concentration deficits when anxious, poor motivation, and a lack of self-[c]are. However, secondary to medication change and the initiation of therapy services with individual DBT and group sessions, the claimant reported doing better. In November 2023, the claimant reported that she was cleaning her son's barbershop twice weekly as a way to help contribute to the family (11F). Meanwhile, updated group therapy records have typically described the claimant as engaged and attentive, though she sometimes presented as emotional or mildly anxious, often due to marital conflicts. In April 2024, the claimant admitted to not taking any medication due to a need to find a new psychiatrist, as her current doctor would no longer prescribe her a stimulant for her ADHD. Though she reported [ ] not functioning well off her regular medication with difficulty attending to her own hygiene needs, she denied experiencing any major emotional outbursts and indicated that she was trying to stay busy (Exhibit 13F).
>
> On May 21, 2024, the claimant underwent an initial psychiatric evaluation to establish care for ongoing medication management. She reported that she has been off medication for about a month due to an insurance change. The claimant endorsed multiple stressors including the loss of her job and financial problems. She endorsed symptoms including hopelessness, not socializing, and feeling overwhelmed. She denied thoughts of harming herself, hallucinations, or paranoia. Upon initial examination, the claimant was cooperative with normal eye contact, a depressed and anxious mood and normal affect, logical, clear, and goal-directed thought processes, good insight and judgment, and normal attention. She was assessed with major depressive disorder, anxiety disorder, and ADHD. The claimant was restarted on medication (Exhibit 13F). Follow-up group and individual therapy records through July 2024 have continued to describe dysregulation of moods due to being prescribed decreasing amounts of stimulant medication (Exhibit 13F).

(R. 24).

Other than declaring that this evidence reflects findings that "would certainly impact the

Plaintiff's ability to perform substantial gainful activity" and therefore undermine the opinions of the State agency consultants and consultative examiner credited by the ALJ, (Pl.'s Br., ECF No. 8, at 7), she makes no attempt to explain with any specificity *how* these records advance her claim. *See Woodson*, 661 F. App'x at 766 (rejecting claim where the plaintiff "ha[d] not affirmatively pointed to specific evidence that demonstrate[d] he should succeed"); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3rd Cir. 2011) ("State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act," and the opinions of these non-examining sources can override the treating sources' opinions provided they are supported by substantial evidence in the record). Indeed, when the Commissioner highlighted this fact in his response, Plaintiff opted not to file any reply clarifying her arguments or fine-tuning the evidentiary basis for them. *See Groff v. Kijakazi*, No. 20-cv-06040-RAL, 2022 WL 17083647, at *5 (E.D. Pa. Nov. 17, 2022) ("It is necessary to demonstrate, not just assert, that the ALJ erred. Demonstration calls for careful citation to the evidence, not just a conclusory assertion that leaves the judge to search through 1,000 pages of records to see if the assertion is so.") (citing *United States v. Shulick*, 18 F.4th 91, 113 (3d Cir. 2021)). Accordingly, the Court denies her claim.

## VI. CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **DENIED**.

BY THE COURT:

/s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge